**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gayle S. Barry, | No. CV-09-1677-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael J. Astrue, Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Gayle Barry seeks review of the administrative denial of her application for social security disability insurance benefits pursuant to 42 U.S.C. § 405(g). Before the Court are Plaintiff's Opening Brief (doc. 16), Defendant's Motion to Remand (doc. 27) and Memorandum in Support of Motion to Remand (doc. 28), treated as a Response to the Opening Brief, and Plaintiff's Reply (doc. 29). For the following reasons, the Motion is denied and the case is remanded for calculation and payment of benefits.

**I.  Background**

Barry filed an application for Title II social security disability insurance benefits on March 27, 2007. She alleged a disability onset date of May 31, 2006, due to migraine headaches, fibromyalgia, lower back pain, fatigue, depression, and anxiety. Her application was denied initially on August 1, 2007, and again upon reconsideration on March 12, 2008.

On October 14, 2008, an Administrative Law Judge ("ALJ") held a hearing to determine whether Barry was entitled to benefits. The following evidence was presented.

### A. Barry's Background

Barry was born on July 11, 1971. At the time of the hearing, she was 37 years old and had been separated from her husband for ten months. She rents an apartment, which she shares with her thirteen-year-old daughter. Barry completed high school, one year of college, and a phlebotomy technician course. Her work history reflects a broad array of jobs. She has worked as an administrative assistant at a behavioral health facility, an administrative assistant in the home remodeling business, a supermarket cashier, a veterinary assistant, an oncology clinic receptionist, a poultry company receptionist-switchboard operator, a bank teller, a phlebotomist, and, most recently, a receptionist at a construction company. The length of time worked in each position ranges from a few months to between two and three years. She was "let go" from her most recent job after three months because her attendance was spotty and she cried a lot at work.

### B. Barry's Testimony

Barry was diagnosed with fibromyalgia approximately four years before the hearing and has been suffering from degenerative disc disease for many years. Her resulting physical problems include difficulty sleeping through the night due to lower back pain and leg aches, resulting daytime exhaustion, neck pain, headaches four or five times a week, and a general achy feeling all over her body. As far as treatment is concerned, Barry has received steroid injections, but they provided little relief. After being hospitalized for a near nervous breakdown in May 2008, she was removed from her pain medications and began treating with Dr. Calkins, a pain management physician. He prescribed Avinza, a Morphine-based time release pain medication, and Hydrocodone for break-through pain. Barry testified that the medications provide temporary relief that does not last longer than two weeks at a time.

Barry also suffers from emotional problems. She has been diagnosed with severe depression and anxiety. After her hospitalization in May 2008, she was referred to nurse practitioner Michelle Onaki, who prescribed both Zoloft and Wellbutrin, which, according

to Barry, are largely ineffective.

Barry's daily activities are limited. Because of her pain, she is unable to stand or sit for more than an hour at a time and must alternate between sitting and standing. She spends most of her day lying down, resting, or napping. She testified that "if [she] could, [she] would just sleep all day." She starts out her day with good intentions, but runs out of energy halfway through. When she cooks, she makes frozen lasagna, hamburgers, or macaroni and cheese, and she is teaching her daughter how to cook for them. She usually waits for her daughter to get out of school to help with the shopping. If possible, she does not leave the apartment because she "feel[s] safe" in her room. Other than dropping her daughter off and picking her up from school, which is five minutes away from the apartment, and going to the grocery store, which is down the street, she does not drive or go anywhere. Her parents occasionally pick her up to spend weekends with them.

Barry also testified that she has difficulty concentrating, cries "all the time," and feels irritable and grumpy much of the time. She was "let go" from her most recent job because she was "not able to be there every day and cried a lot at work and just wasn't able to mentally handle it." She rarely reads because by the end of a page, she cannot remember what she read. Her physicians have encouraged her to exercise, but she finds it difficult to motivate herself to go. She also feels that exercise aggravates her conditions.

**C.  Non-Medical Documentary Evidence**

Barry completed four Social Security Administration ("SSA") forms and questionnaires throughout the administrative process. In the first form, Exhibit 2E, she indicated that she suffers from migraine headaches, fibromyalgia, lower back pain, fatigue, depression, and anxiety. She further stated that these conditions cause extreme pain and she is "hardly able" to walk and cannot sit for long periods of time. In the second form, Exhibit 4E, she explained that she is "always in pain and extremely tired," has to lay down and nap throughout the day, and is limited in her activities. She also explained that her daily activities include waking up, packing her daughter's lunch for school, taking her to school, coming home, going back to bed for an hour or so, occasionally doing household chores,

going to the grocery store, if necessary, picking her daughter up from school, making dinner, watching television, and going to bed. In the third form, Exhibit 9E, she referred to a decline in her efforts to maintain personal hygiene, indicated the pain was getting worse, and stated that she leaves the house less often. In the fourth and final form, Exhibit 13E, she referred to recent diagnoses of mental impairments, including a mood disorder, indicated her pain had increased, and stated that she is afraid to leave the house. She also referenced her inability to maintain a full-time work schedule due to her frequent health-related absences.

Barry's mother, Nancy Hudson, also completed a number of forms. Mrs. Hudson's account of Barry's daily activities substantially mirrors Barry's account. Mrs. Hudson indicated that Barry does not sleep well at night and that while she seems to be able to follow written and oral instructions, she has trouble concentrating and has missed a significant amount of work due to debilitating pain and extreme fatigue. She has been fired for her inability to maintain regular work attendance.

**D.     Medical Evidence**

    **1.     Physical Impairments**

In January 2006, Barry began treating with Dr. Donald Fruchtman, D.O., for lower back pain. He prescribed both Oxycontin and epidural injections. After Barry's pain persisted into March 2006 and a February 8, 2006 MRI showed mild degenerative disc disease without herniation and degenerative disease of the facet joints, Dr. Fruchtman referred Barry to Dr. Areena Swarup, M.D., a rheumatologist.

At an April 28, 2006 examination, Barry complained to Dr. Swarup "chiefly of localized lower back pain" but Dr. Swarup noted that Barry had "the usual array of fibromyalgia symptoms with pain above and below the waist on both sides of the body, fragmented nonrestorative sleep, and persistent fatigue." Dr. Swarup also noted that while Barry's pain scale was at an 8-9/10, she remained "quite functional." Dr. Swarup ultimately diagnosed Barry with fibromyalgia, typified by "widespread myofascial trigger areas," depression, and, based on the February 8, 2006 MRI, mild degenerative disc disease of the lumbar spine. She prescribed Neurontin and physical therapy. At a follow-up examination

on May 30, 3006, Dr. Swarup diagnosed Barry with fibromyalgia, depression, insomnia, and mild degenerative joint disease of the lumbar spine.

Barry continued treating with Dr. Fruchtman for some period of time, but was eventually referred to Dr. David Herbert, M.D., of Advanced Pain Modalities. At that time, she was taking Zoloft, Wellbutrin, Trazodone, and Hydrocodone. On September 4, 2007, Dr. Herbert performed an examination for fibromyalgia, which was negative, but he indicated that "fibromyalgia may or may not be a part of this." He also noted the possibility that facet joint hypertrophy/anthropathy and "degenerative changes" on the lumbar spine were the cause of her pain. On September 7, 2007, Dr. Herbert treated Barry with left-sided intra-articular facet joint injections. His preoperative diagnoses included facet joint arthropathy, lumbar degenerative disc disease, and myofascial pain. Because Barry continued to have pain after the injections, Dr. Herbert ruled out facet joint arthropathy and narrowed his diagnoses to lumbar degenerative disc disease and myofascial pain. On September 24, 2007, he ordered an MRI of the cervical spine, which revealed degenerative changes. He therefore included cervical spinal stenosis as a diagnosis. On November 2, 2007, he administered an interlaminar cervical epidural steroid injection.

Barry returned to Dr. Fruchtman on November 20, 2007, complaining of "excessively bad" back pain. She told Dr. Fruchtman that "no one understands her life, she is depressed, lays in bed all day, has pain all day and pain meds are no longer helping." He referred her to a pain clinic. In the meantime, Dr. Herbert continued his treatment with injections on December 14, 2007, and April 4, 16, and 30, 2008. On December 14, 2007, he noted that Barry's headaches were "significantly diminished" but her lower back pain persisted. On April 16, 2008, Dr. Herbert expressed concern that Barry was continuing to take pain medication even in the absence of pain and that she was heading "down the pathway of dependancy." He also expressed his desire to wean her off the pain medication to avoid dependancy and to discover the true source of her pain. On April 30, 2008, Dr. Herbert indicated that Barry was "doing quite well," that she continued to use a Fentanyl patch and to take Norco once or twice a day, and that she had "no pain whatsoever." He indicated that

while he was "pleased with the results," he wanted to wean her from her pain medication after the last injection to "see where she has the pain or if she has any left." He therefore reduced her dosage of Fentanyl.

Not even a week later, on May 5, 2008, Barry was hospitalized at St. Luke's Behavioral Health for suicidal thinking. Upon discharge on May 13, 2008, she stopped treating with Dr. Herbert and began treating with Dr. David Calkins, M.D. At her initial appointment, Barry complained of lower back and leg pain, neck pain, headaches, poor sleep, weakness, fatigue, inability to keep her job, difficulty performing any physical activity, impaired personal relationships, and depression. She indicated that acupuncture, massage therapy, physical therapy, and trigger point injections had proved ineffective. Dr. Calkins noted that Barry's 2006 MRI was normal except for "some loss of disk height and disk signal without herniation" and "degeneration of the zygapophyseal joints." He also noted that she was taking psychiatric medication for possible bipolar disorder and depression. He ultimately diagnosed her with lumbago, sciatica, sacroiliitis, cervicalgia, and anxiety. For treatment, he suggested interventional diagnostic and therapeutic injections with careful monitoring of her psychiatric condition and use of medications. In September 2008, Barry reported 70-80% relief in the targeted pain. However, on February 4, 2009, after months of treatment, Barry reported that she was still experiencing pain on a level of 6 to 9/10 on a regular basis. Dr. Calkins indicated that her pain "has been resolved as well as can be expected by addressing the degeneration in pathology and the sacroiliac joint complexes" and that she would be "a good candidate for intradiscal blacuplasty," which she subsequently received on March 24, 2009.

### 2. Mental/Emotional Impairments

In 2007, Barry began treating with Dr. Sharon Frick, Ph.D., for a variety of emotional issues. At Barry's initial intake on April 10, 2007, Dr. Frick noted that Barry was experiencing problems with her marriage and recorded several symptoms, including difficulty making decisions, loss of interest in pleasurable activities, nervousness, anxiety, and sleep disturbance. On May 22, 2007, Barry reported "feeling very exhausted." In early

- 6 -

2008, she told Dr. Frick that she had been involved in a physical altercation with her husband and said that she felt "completely alone" and "very depressed." On April 21, 2008, Barry said she felt "severely depressed" and was "not sleeping." Shortly thereafter, on May 5, 2008, Dr. Frick concluded that Barry needed hospitalization. Therefore, she was admitted to St. Luke's Behavioral Health that same day.

Barry's in-patient treatment records at St. Luke's indicate that she presented with symptoms of depression, opioid dependence related to chronic pain from degenerative disc and joint disease in her back, and migraine headaches. At the time, she was taking Zoloft, Wellbutrin, Xanax, Trazodone, and a variety of other pain medications. She reported suicidal thoughts, chronic pain, insomnia, and a history of depressive, irritable, and anxious moods. She was highly distracted, exhibited circumstantial though patterns, racing thoughts, and pressured speech. Her diagnoses at the time of admission were mood disorder not otherwise specified, probable Bipolar I disorder without psychotic features, and opioid dependence. Over the next few days, she was treated with psychotherapy, group therapy. She was also removed from her pain medications and prescribed new medications on a trial basis.

Upon discharge from St. Luke's on May 13, 2008, Barry continued to treat with Dr. Frick but was also referred to Michelle Onacki, Psy. NP, a psychiatric nurse practitioner, for continued psychiatric monitoring. In a "Mental Status Examination" on May 30, 2008, Nurse Onacki noted that while Barry was well-groomed and alert, she exhibited anxious, agitated behavior and rapid, pressured speech. Furthermore, her mood was depressed, hopeless, anxious, and irritable, and she had fleeting suicidal thoughts. Her ability to pay attention was intact. Based on the foregoing, Nurse Onacki diagnosed Barry with depression not otherwise specified, noted that fibromyalgia and degenerative disc disease were relevant physical conditions, and concluded that her symptoms were serious. Her treatment plan involved a series of changes to her medication dosage and routine. Barry treated with Nurse Onacki on eight different occasions, often reporting sleeplessness and presenting in a tearful, sad, and depressed mood with poor concentration. On December 1, 2008, Nurse Onacki completed a "Medical Source Assessment (Mental)," in which she concluded that Barry has

moderately severe limitations on her ability to pay attention and concentrate for extended periods of time, and severe limitations on her abilities to perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek due to her psychological problems, and perform at a consistent pace without an unreasonable number and length of rest periods. She also reported mild to moderate limitations in a number of other capacities, including memory, comprehension, decision-making, ability to interact with others, and ability to adapt to changes in the work setting.

In addition to Barry's treating physicians, Dr. Inayat Alikhan, M.D., Dr. Randall Garland, Ph.D., Dr. Steven Hirdes, Ed.D, and Dr. Stephen Bailey, Ed.D, all provided opinion evidence as to the extent of the limitations on Barry's ability to work. Dr. Alikhan, a state agency psychiatrist, conducted a psychiatric interview on June 19, 2007. At the interview, Barry complained that she was "always sick" and suffered from depression, anxiety, migraine headaches, and poor concentration. Dr. Alikhan noted that Barry's speech was slow, her attention span was short, her affect was flat, and she appeared depressed and anxious. Dr. Alikhan diagnosed Barry with moderately severe major depression, moderately severe generalized anxiety disorder, and somatization disorder. His prognosis was "fair to guarded due to depression and somatic complaints" and he noted that she was "unable to cope with any gainful employment at present." Dr. Alikhan also completed a "Medical Source Statement (Mental)" in which he noted moderate limitations on her abilities to remember locations and work-like procedures, pay attention and concentrate for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek due to her psychological problems, and perform at a consistent pace without an unreasonable number and length of rest periods. In Dr. Alikhan's form, "moderately limited" was defined as "fair/limited but not precluded" and fell somewhere between "not significantly limited" and "markedly limited."

Dr. Garland did not treat or examine Barry. He relied solely on Dr. Alikhan's report and statements from Barry and her mother. In a July 30, 2007 "Mental Residual Functional Capacity Assessment," he agreed that Barry is moderately limited in her abilities to pay

attention and concentrate for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek due to her psychological problems, and perform at a consistent pace without an unreasonable number and length of rest periods. Despite these findings, he concluded that Barry is "able to meet the basic mental demands of competitive, remunerative, unskilled work" because she is capable of carrying out simple instructions, making work-related decisions, responding to supervision, and dealing with changes in a routine work setting.

Dr. Hirdes, a state agency psychologist, interviewed Barry and conducted a mini mental status examination on March 3, 2008. He noted that Barry moved very slowly and was clearly in "physical discomfort." She presented with a "sad affect," cried easily and frequently throughout the interview, and complained about her lack of motivation, inability to concentrate, sleeplessness, diminished appetite, and persistent fatigue. Dr. Hirdes diagnosed depression not otherwise specified and anxious features. He also completed a "Psychological/Psychiatric Medical Source Statement" in which he concluded that Barry has significant deficits, "at least in the moderately severe range," in her ability to pay attention and concentrate for extended periods of time. As for the remaining three categories provided in the form, Dr. Hirdes found no evidence of deficits in understanding, memory, and adaptation, and simply noted that Barry was isolative and socially withdrawn.

Finally, Dr. Bailey completed the same "Mental Residual Functional Capacity Assessment" as that provided to Dr. Garland. Just as Dr. Alikhan and Dr. Garland did, Dr. Bailey concluded that Barry is moderately limited in her abilities to pay attention and concentrate for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual. Though he found no significant limitation on her abilities to complete a normal workday and workweek and perform at a consistent pace without an unreasonable number and length of rest periods, he found moderate limitations on her abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. He therefore suggested that a "low stress, and a low social demand setting may work best for this claimant."

- 9 -

### E. Vocational Testimony

Based on his residual functional capacity assessment, the ALJ presented the following hypothetical to Mark Kelman, a vocational expert:

> [S]omeone who's 37 years old with a high school education who is able to do light exertional level work, wouldn't have to lift any more than 20 pounds occasionally and up to ten pounds on a more frequent basis, and the job would be unskilled.
> . . . .
> And there would be postural restrictions so there would be no crawling or crouching or climbing or squatting or keeling, and there would be lower extremity limitations so there would be no use of the legs or feet for pushing or pulling of foot or leg controls, and there would be upper extremity limitations so there would be no use of the arms for work above shoulder level.

Mr. Kelman opined that someone with the above limitations would be able to work as a housekeeper, janitor, or food preparation worker, all of which exist in significant numbers in the national economy.

The ALJ then referred Mr. Kelman to the fact that Barry had been fired from her last job because of her spotty attendance. He specifically asked Mr. Kelman how many days an employer would allow someone to miss before firing that person. Mr. Kelman responded:

> I think a pattern of one day a month ongoing, consistent, month after month, and going into the third month, I think a worker would be reprimanded, put on notice, and I think ultimately would lead to termination. That pattern is not acceptable.

The ALJ did not follow up on Mr. Kelman's response. When Barry's counsel followed up by asking whether the limitations included in Dr. Alikhan's checklist, namely a moderate restriction on maintaining a schedule, maintaining regular attendance, and being punctual, would preclude the jobs Mr. Kelman initially identified, Mr. Kelman admitted that those limitations would in fact preclude those jobs.

On February 6, 2009, the ALJ issued a "Notice of Decision - Unfavorable," finding that Barry is not disabled. Barry subsequently requested administrative review, but the Social Security Administration Appeals Council denied her request on June 15, 2009, rendering the ALJ's decision the Commissioner's final decision.

## II. Standard of Review

A court may set aside the Commissioner's denial of benefits "only if it is not

supported by substantial evidence or is based on legal error." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Id.* In evaluating whether the decision is supported by substantial evidence, the court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* (internal quotes omitted).

If the evidence reasonably supports the Commissioner's decision, it must be affirmed. *Id.* On the other hand, if the decision is not supported by substantial evidence or suffers from legal error, the court has discretion to reverse and remand either for an award of benefits or for further administrative proceedings. *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). "Remand for further proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Id.* (citing *Smolen*, 80 F.3d at 1292).

**III.   Analysis**

The Social Security Act defines "disability" as the inability to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). In determining whether a claimant is disabled, an ALJ applies a five-step sequential review process. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). If the ALJ determines that the claimant is disabled or not disabled at any step, the ALJ does not continue to the next step. *Id.*

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). If so, the claimant is not disabled and the

inquiry ends. *Id.* At the second step, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meet or equal an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.* "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222.

In this case, the ALJ found at step one that Barry had not engaged in substantial gainful activity since her alleged disability onset date of May 31, 2006. At step two, he determined that Barry has a combination of medically determinable physical and mental impairments that are severe in combination. The impairments include fibromyalgia, degenerative disc disease, depression, and anxiety. At step three, however, he concluded that Barry's combination of impairments do not meet or medically equal one of the listed impairments in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. Therefore, he proceeded to step four, where he initially assessed Barry's residual functional capacity and concluded that she is capable of performing light, unskilled work. Based on that residual functional capacity assessment, the ALJ found that Barry is incapable of performing her past relevant work. Finally, at step five, he considered the testimony of Mark Kelman, the vocational expert, and concluded that Barry is capable of performing jobs such as housekeeper, janitor, or food preparation worker. As a result, he concluded that Barry is not disabled and accordingly denied benefits.

Barry contends that the ALJ (1) improperly discredited her testimony regarding her subjective pain and other symptoms, (2) improperly weighed and considered the medical opinion evidence in determining her residual functional capacity, and (3) improperly concluded that she is capable of performing the jobs of housekeeper, janitor, and food preparation worker. She therefore seeks a remand of this case for the immediate payment of benefits. In the alternative, she seeks a remand for further administrative proceedings before a new ALJ with an instruction to credit as true her testimony regarding the severity and functional limitations of her pain and other symptoms.

The Commissioner, in his Motion to Remand, concedes that the ALJ's residual functional capacity assessment was not supported by substantial evidence because the ALJ improperly considered only part of the opinion of Dr. Stephen Bailey, a state agency reviewing psychologist whose opinion was given controlling weight. Specifically, the Commissioner acknowledges that the ALJ addressed some of the limitations identified by Dr. Bailey, but not others. However, the Commissioner does not agree that the ALJ erred in rejecting Barry's testimony regarding the severity of her pain. Nor does he agree that the ALJ improperly weighed the other medical opinion evidence in this case. In light of these disagreements, the Court will address all challenges the Commissioner has not conceded.

### A. Rejection of Barry's Testimony

In evaluating the credibility of a claimant's testimony regarding pain or other symptoms, an ALJ "must engage in a two-step analysis." *Lingenfelter*, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal quotes omitted). The claimant need not show that the impairment could reasonably cause the severity of the symptom; she need only show that it could reasonably be expected to cause "some degree" of the symptom. *Id.* "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal quotes omitted).

Once the claimant produces medical evidence of an underlying impairment, the claimant's testimony as to the severity of symptoms may not be discounted solely because it is unsupported by the objective medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). In evaluating the credibility of a claimant's testimony, ALJs may consider the following factors: the claimant's reputation for truthfulness, inconsistencies in the claimant's testimony or between his testimony and his conduct, the claimant's daily activities, the claimant's work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms complained of. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick*, 157 F.3d at 722.

In his written decision, the ALJ introduced his analysis of Barry's residual functional capacity with a general conclusion that she has the residual functional capacity to perform light, unskilled work. He then began his analysis with a summary of Barry's testimony and explained that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . ." He further found that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." He then went on to articulate why he was discounting her testimony as to the severity of her pain.

Because the ALJ found that Barry's medically determinable impairments could reasonably be expected to cause some degree of the symptoms alleged, and because he made no findings of malingering, he was required to offer specific, clear, and convincing reasons for discrediting Barry's testimony as to the severity of her symptoms and limitations. Barry raises a number of challenges to the legal sufficiency of the ALJ's rejection of her testimony. First, she contends that the ALJ's statement that her testimony is not credible "to the extent" it is inconsistent with "the above residual functional capacity assessment" indicates that the ALJ improperly assessed her residual functional capacity before evaluating her testimony. At first glance, the contention appears to hold weight, but a review of the remainder of the

ALJ's residual functional capacity analysis indicates that the ALJ did weigh Barry's testimony prior to reaching his conclusion. He did not discredit her testimony *because* it was inconsistent with his residual functional capacity assessment. Rather, he explained that he was rejecting it *to the extent* it was inconsistent with his assessment and then went on to explain *why* he was rejecting it. Therefore, Barry's initial challenge lacks merit.

The analysis is, however, flawed for another reason. The ALJ began his analysis by stating that Barry "has alleged that she has been unable to engage in all work related activity primarily due to severe and chronic pain." The statement ignores all of her testimony regarding the limiting effects of her severe depression and anxiety, both of which were expressly recognized by the ALJ as two of her impairments. As a result of this unjustifiably narrow statement, the ALJ addressed only the credibility of Barry's testimony regarding the severity of her physical pain, which is evident from his final conclusion, "Given the above factors, the undersigned in unable to accept the claimant's subjective pain complaints." Because he provided no specific, clear, and convincing reasons for discrediting Barry's testimony as to the limiting effects of her mental impairments, that testimony, at a minimum, should have been incorporated into the residual functional capacity assessment. There is no indication that it was. In light of this error, the Court finds it unnecessary to address whether the ALJ properly rejected Barry's subjective pain complaints.

### B. Weighing of the Medical Evidence

The Ninth Circuit distinguishes among three types of physicians in social security cases: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians. *Id.* Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Id.* Even where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Id.*

"The opinion of an examining physician is, in turn, entitled to greater weight than that of a non-examining physician." *Id.* As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion. *Id.* at 830-31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician. *Id.* at 831. Notwithstanding the aforementioned general rules, the opinion of any physician, including a treating physician, need not be accepted, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray*, 554 F.3d at 1228 (citing *Thomas*, 278 F.3d at 957).

In this case, the ALJ declined to assign controlling weight to the assessments of Nurse Practitioner Onacki, Dr. Alikhan, and Dr. Hirdes and instead relied solely on Dr. Bailey's assessment. The ALJ rejected the Nurse Practitioner Onacki's opinion primarily because she is "not a psychiatrist or psychologist" and treated Barry "for a relatively short time period . . . ." The second reason is disingenuous because Onacki treated Barry on eight different occasions in contrast to Dr. Bailey, who neither treated nor examined Barry, but whose opinion was nevertheless assigned controlling weight. The first reason is a closer question. Nurse practitioners are not "acceptable medical sources," as defined in 20 C.F.R. § 404.1513(a). Therefore, they are not considered "treating sources" and their opinions may not be used to establish a medically determinable impairment. *Id.*; *see also id.* § 404.1502. However, their opinions may be considered in evaluating the severity of the impairment and how it affects the ability to work. *Id.* § 404.1513(d). Moreover, the opinion of a nurse practitioner may be given more weight than that of even a treating source if the nurse practitioner "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation of his or her opinion." Social Security Ruling 06-03p. With that in mind, the ALJ's conclusory reference to the fact that Onacki is not a licensed doctor is clearly an insufficient basis, without further explanation, for entirely

disregarding her opinion. Onacki actually saw Barry, unlike Dr. Bailey. Furthermore, ALJs are charged with considering all the evidence in the record, particularly where it corroborates other medical opinions.

The ALJ also gave insufficient reasons for declining to assign controlling weight to the opinions of Dr. Alikhan, the state agency examining psychiatrist, and Dr. Hirdes, the state agency examining psychologist. In doing so, the ALJ referred to "inconsistencies" between their opinions but failed to explain what the inconsistencies were. Both diagnosed her with depression and anxiety, both noted her sad, flat affect, both indicated that she was isolating herself, and both noted at least moderate limitations on her abilities to pay attention and concentrate for extended periods. To the extent there is no further overlap between the opinions, it is unclear whether the two doctors were provided the same form with the same questions. In any event, the two opinions do not obviously contradict each other in any way. The ALJ's second reason, that neither doctor had access to all the evidence and both based their opinions on Barry's subjective reports of symptoms, is similarly insufficient. First, no explanation is given as to what evidence was not available and how it may have changed their opinions, particularly in light of the fact that both actually examined Barry in person. Second, because the ALJ did not address the credibility of Barry's subjective testimony about the limiting effects of her depression and anxiety, the mere fact that the two doctors may have based their opinions partly on her subjective complaints is not enough to warrant rejection. Furthermore, their opinions were based in part on their own independent observations and evaluations of Barry's appearance and demeanor.

### C.     Residual Functional Capacity Finding

A residual functional capacity finding involves a detailed assessment of how a claimant's medical impairments affect her ability to work. In determining a claimant's residual functional capacity, the ALJ "must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of all symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. SSA*, 466 F.3d 880, 883 (9th Cir. 2006). The ALJ must consider the combined

effect of multiple conditions, including those that are not severe. *See* 20 C.F.R. § 404.1545(a)(2).

Here, without sufficient explanation, the ALJ failed to consider Barry's testimony as to the limiting effects of her depression and anxiety, in particular, her testimony that she was "let go" from her last job precisely because of her irregular attendance and inability to control her emotions. He also improperly disregarded the opinions of Dr. Alikhan and Dr. Hirdes. Therefore, the ALJ's finding that Barry has the residual functional capacity to perform light, unskilled work suffers from legal error.

Even without considering these legal errors, the ALJ's assessment is still not supported by substantial evidence. In concluding that Barry is capable of performing light, unskilled work, the ALJ relied on the opinion of Dr. Bailey, the state agency non-examining psychologist. However, he failed to explain how Dr. Bailey's opinion supports the finding. After summarizing and rejecting the testimony of Dr. Alikhan, Dr. Hirdes, Dr. Fruchtman, Nurse Practitioner Onacki, and Barry's mother, the ALJ simply concluded without explanation, "In sum, the above residual functional capacity is supported by the conclusions of the reviewing psychologist for the state agency."

Contrary to the ALJ's statement, Dr. Bailey's opinion does not substantially support the residual functional capacity assessment. The assessment is consistent with Dr. Bailey's conclusion that Barry is capable of completing a normal workday and workweek and performing at a consistent pace without an unreasonable number and length of rest periods. It is even reasonably consistent with Dr. Bailey's finding of moderate limitations on Barry's abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. However, as the Commissioner concedes, it is inconsistent with Dr. Bailey's conclusion that Barry is moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual. Significantly, of Dr. Alikhan, Dr. Garland, Dr. Hirdes, Dr. Bailey, and Nurse Practitioner Onacki, all but Dr. Hirdes found those same limitations. The ALJ made no mention of these limitations whatsoever and entirely failed to explain how they do not

undermine his residual functional capacity assessment. It was therefore error not to consider them in assessing Barry's residual functional capacity.

### D. Capability of Performing Other Work

At step five, ALJs are charged with determining whether the claimant is capable of performing substantial work in the economy in light of the claimant's age, education, work experience, and residual functional capacity. In concluding that Barry is capable of working as a housekeeper, janitor, or food preparation worker, the ALJ expressly relied on Mr. Kelman's response to the following hypothetical:

> [S]omeone who's 37 years old with a high school education who is able to do light exertional level work, wouldn't have to lift any more than 20 pounds occasionally and up to ten pounds on a more frequent basis, and the job would be unskilled.
> . . . .
> And there would be postural restrictions so there would be no crawling or crouching or climbing or squatting or keeling, and there would be lower extremity limitations so there would be no use of the legs or feet for pushing or pulling of foot or leg controls, and there would be upper extremity limitations so there would be no use of the arms for work above shoulder level.

While the hypothetical correctly incorporated Barry's age and education, it was based on a residual functional capacity assessment that was deficient, as explained above. Specifically, it failed to incorporate limitations on Barry's abilities to maintain a regular work schedule and be punctual. Therefore, Mr. Kelman's initial identification of the three aforementioned jobs, upon which the ALJ expressly relied in concluding that Barry was not disabled, was unreliable.

### E. Remedy

As explained, if an ALJ's decision is not supported by substantial evidence or suffers from legal error, the court has discretion to reverse and remand either for an award of benefits or for further administrative proceedings. Where the record has been developed fully and further administrative proceedings would serve no useful purpose, remand for an immediate award of benefits is appropriate.

As the Commissioner concedes, in light of the ALJ's failure to consider the limitations on Barry's abilities to maintain a regular work schedule and be punctual, a remand for further

proceedings is warranted in this case. While the Court recognizes that remand for further proceedings is an option, it will exercise its discretion to remand for immediate calculation and payment of benefits. After considering all the limitations identified by Dr. Alikhan, Dr. Bailey, and Nurse Practitioner Onacki, the inescapable conclusion is that Barry has significant limitations on her abilities to maintain a regular work schedule and be punctual. The record is fully developed as to whether these limitations preclude the performance of other work because both the ALJ and Barry's counsel asked Mr. Kelman, the vocational expert, whether such limitations would preclude the three jobs he initially identified. Mr. Kelman unequivocally testified that a consistent pattern of missing even one day a month would be "unacceptable" and "ultimately would lead to termination." He also expressly opined that the inability to maintain a regular work schedule and be punctual would preclude all three jobs he identified as work Barry would be able to perform. Because substantial evidence requires the conclusion that Barry is not capable of performing gainful employment in the national economy, a finding that she is disabled is warranted. Remand for an award of benefits is therefore appropriate. *Cf. Benecke*, 379 F.3d at 595 (where it is clear from the record that the claimant is "unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate.").

IT IS THEREFORE ORDERED that the Clerk enter judgment remanding this case for the immediate calculation and payment of benefits. The Clerk shall terminate this action.

DATED this 10th day of August, 2010.

_____
Neil V. Wake
United States District Judge